# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-707V
UNPUBLISHED

| | |
|---|---|
| STEVEN S. FLOYD,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: August 19, 2021<br><br>Special Processing Unit (SPU); Findings of Fact; Onset; Ruling on Entitlement; Tetanus-Diphtheria-acellular Pertussis (Tdap); Shoulder Injury Related to Vaccine Administration (SIRVA). |

*William E. Cochran, Jr.*, Black McLaren et al., P.C., Memphis, TN , for Petitioner.

*Lara Ann Englund*, U.S. Department of Justice, Washington, DC, for Respondent.

### FINDINGS OF FACT AND RULING ON ENTITLEMENT[1]

On May 14, 2019, Steven S. Floyd filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of his receipt of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on February 3, 2018, he suffered a shoulder injury related to vaccination ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). In the alternative, Petitioner alleges that his injuries were caused in fact by the Tdap vaccine. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished opinion contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the opinion will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner likely suffered the onset of shoulder pain within 48 hours after vaccination. Moreover, Petitioner has established the other requirements for a Table SIRVA injury. Thus, Petitioner is entitled to compensation.

## I. Relevant Procedural History

On June 26, 2020, approximately fifteen (15) months after Petitioner filed his claim with all required supporting documentation, Respondent formally opposed compensation, but contested only the issue of onset for the alleged Table SIRVA claim. Rule 4(c) Report (ECF No. 18) at 5.[3] I then provided the parties the opportunity to file any additional evidence or memoranda relevant to onset. Order to Show Cause (ECF No. 19). Petitioner filed additional affidavits and medical records as his Exhibits 14-23, followed by a memorandum regarding onset on December 4, 2020. Pet. Brief (ECF No. 25). Respondent filed a response on January 7, 2021. Resp. Response (ECF No. 26). This matter is now ripe for adjudication.

## II. Finding of Fact Regarding Onset

At issue is whether Petitioner's first symptom or manifestation of onset after vaccine administration (specifically, pain in the relevant shoulder) occurred within 48 hours as set forth in the Table and the accompanying Qualifications and Aids to Interpretation ("QAI") for SIRVA. 42 C.F.R. § 100.3(c)(10)(ii).

### A. Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

---

[3] With regard to Petitioner's off-Table claim, Respondent averred that the medical records did not establish causation-in-fact and noted that Petitioner had not yet filed an expert report. *Id.* at 6 (citing *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005)).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

### B. Findings of Fact

I make the following findings after a complete review of the record, including all medical records and affidavits, Respondent's Rule 4(c) report, and the parties' briefing:

- On February 3, 2018, at approximately 6:20 p.m., Petitioner presented to an emergency room seeking a tetanus vaccine after wounding his left thumb

3

on a rusty nail. Ex. 2 at 164. The Tdap vaccine was administered in his left deltoid. *Id.* at 177, 182.[4]

- Petitioner's first post-vaccination medical encounter was a February 20, 2018, oncology six-month follow-up appointment for smoldering multiple myeloma. Ex. 9 at 16-21.[5] Petitioner's myeloma, and as an associated peripheral neuropathy (primarily affecting his feet) were stable. *Id.* at 16. Petitioner reported that "overall he has been doing well" except for a brief and uncomplicated flu infection. *Id.* He did not mention his shoulder. *Id.* The oncologist's physical exam record does not address the presence or absence of pain, range of motion, or other findings pertaining to the shoulder. *Id.* at 19.

- On February 21, 2018, Petitioner presented to his established primary care practice for symptoms including depression, anxiety, insomnia, and gastrointestinal issues. Ex. 3 at 396. He denied chest pain, decreased concentration, dizziness, nausea, palpitations, or shortness of breath. *Id.* at 396. He reported myalgias but not arthralgias, gait problems, neck pain, or neck stiffness. *Id.* at 397.[6] A physical exam was normal but did not specifically refer to the left shoulder; the musculoskeletal exam reads only: "He exhibits no edema." *Id.* The nurse practitioner entered several prescriptions and referred Petitioner to his gastroenterologist. *Id.* at 398-99.

- On March 17, 2018, Petitioner sought urgent care for "a spot on his left upper arm that look[ed] like a spider bite," a tick bite on his right scapula, mold inhalation, nausea, body aches, headache, and pain beyond his left eye. Ex. 16 at 6. The physical exam revealed "dime-sized area[s] of erythema" on his left upper arm and right upper scapula, but "no induration" or other abnormal findings. *Id.* at 7. The record does not address pain or range of motion. *Id.* The assessments were tick bite, spider bite, chemical pneumonitis, and myalgia. *Id.*

---

[4] During the emergency room encounter, Petitioner also reported a one-day history of flu-like symptoms (cough, fever, sore throat) associated with headaches and myalgias but no arthralgias. Ex. 2 at 165. An infectious disease panel was positive for influenza B. *Id.* at 167. He was diagnosed with an upper respiratory infection and discharged to follow up with his primary care provider, which never occurred. *Id.* at 168.

[5] Petitioner was diagnosed with this pre-cancerous condition approximately two years prior to the Tdap vaccination and the events at issue. *See* Ex. 9 at 40-45.

[6] Petitioner suggests that this reference to non-specific myalgias may support a finding of left shoulder pain as of this date. Pet. Response at 9. However, Petitioner also reported myalgias prior to vaccination, *see, e.g.*, Ex. 2 at 166.

4

- On March 28, 2018, Petitioner presented to his gastroenterologist for recurrent dysphagia, GERD, and related issues. Ex. 17 at 60-62. Petitioner also complained of back, joint, and muscle pains. *Id.* at 61. However, the gastroenterologist did not conduct a musculoskeletal exam. *Id.* at 62.

- On April 11, 2018, Petitioner established care at a new internal medicine practice. Ex. 13 at 16-31. Petitioner provided a comprehensive history including his smoldering multiple myeloma with associated neuropathy as well as osteoporosis, psychiatric conditions, GERD, past right tennis elbow, recent chemical inhalation, past ruptured disc, and recent new low back pain. *Id.* at 16-17. On physical exam, the internist recorded that Petitioner's extremities had no cyanosis, clubbing or edema; his neurological motor and sensory findings were normal; and his musculoskeletal exam showed no active synovitis. *Id.* at 19.

- On April 22, 2018, Petitioner sought urgent care for another insect bite, this time on his left buttock, four days prior. Ex. 8 at 10-18. He also complained of headache, cough, and concerns for dust and mold exposure. *Id.* at 13.

- On April 24, 2018, Petitioner returned to the internal medicine practice for multiple complaints including a new spider bite on his left abdomen, reflux, and shortness of breath. Ex. 13 at 43. Petitioner's recorded complaints as well as the internist's physical exam, assessment, and plan do not address the left shoulder. *Id.* at 32-54.

- On April 27, 2018, and again on June 8, 2018, Petitioner presented to an ear, nose, and throat specialist for right-sided facial pain and headache. Ex. 11 at 2-3.

- On June 5, 2018, Petitioner returned to the primary care practice for a chief complaint of pain in his low back radiating to his right knee and thigh, as well as right-sided sciatica. Ex. 3 at 407-16. He was prescribed a muscle relaxant and referred to physical therapy. *Id.* at 415-16.

- On June 13, 2018, Petitioner had one physical therapy session for his back pain. Ex. 10 at 61-97.[7]

---

[7] Although the physical therapist recorded that further sessions would be beneficial, on July 2, 2018, Petitioner forgot about his second appointment which had been scheduled for that day and he cancelled all further appointments. Ex. 10 at 97.

- On June 18, 2018, Petitioner sought urgent care for bleeding, itching, and pain after pulling a tick out of his belly button. Ex. 8 at 1-9.

- One hundred and thirty-six (136) days post-vaccination, on June 19, 2018, Petitioner presented to an orthopedist, Jeffrey Dlabach, M.D. for a chief complaint of "left shoulder pain, and date of onset: 2/2018." Ex. 4 at 1. Dr. Dlabach recorded: "Symptoms have been ongoing since February 2018. [Petitioner] states at that time he was given an injection after he sustained an injury to his left thumb nail. He was given a vaccine injection in the left deltoid region. He has had pain and discomfort since then and discomfort with his motion." *Id.* Dr. Dlabach also recorded that his shoulder pain "started gradually" and "slowly worsens with extended activity." *Id.* Dr. Dlabach observed tenderness on palpation at the left acromium, deltoid muscle, supraspinatus muscle, and glenohumeral joint. *Id.* at 3. Petitioner was concerned that there may be a "knot or mass" in the shoulder, but Dr. Dlabach thought "what he is feeling is more of the muscle itself." *Id.* at 4. Petitioner had abnormal motion with pain beyond shoulder level; and pain with a Neer's impingement test. *Id.* X-rays of the left shoulder were suggestive of acromial impingement. *Id.* at 3. Dr. Dlabach assessed left-sided rotator cuff tendonitis, impingement syndrome, and bursitis. *Id.*

- In the subsequent medical records, Petitioner consistently linked his vaccine and his left shoulder pain. *See, e.g.*, Ex. 3 at 521, 531 (November 27, 2018, primary care encounter for "left shoulder pain after Tdap 2/3/18"); Ex. 5 at 119 (January 29, 2019, physical therapy evaluation for "L shoulder pain began after receiving Tdap vaccine in L arm in February of 2018"); Ex. 6 at 4 (January 29, 2019, orthopedics encounter for left shoulder pain "since" vaccine in "February 2018").

- Petitioner avers that upon vaccination, he "immediately" experienced pain and tenderness in his left upper arm and shoulder "immediately," which was joined "within a few days" by limited range of motion and "a knot in my left upper arm" near the vaccination site, which have all persisted to date. Ex. 1 at ¶¶ 5, 11.

- In a supplemental affidavit prepared after reviewing my Order to Show Cause, Petitioner adds that he initially took Tylenol, Advil, and Tramadol and Robaxin which he had been prescribed for low back pain for his shoulder pain, which he believed would resolve on its own. Ex. 23 at ¶ 5.

- Petitioner avers that he reported his left shoulder pain and the "knot" to the primary care nurse practitioner on February 21, 2018, and the internist on April 11, 2018. Ex. 1 at ¶¶ 7-8. He was "very surprised" that the records from those specific encounters do not mention his shoulder. Ex. 23 at ¶17.

- Petitioner avers that after the February 23, 2018, primary care encounter, he began internet research on SIRVA and the Vaccine Program. Ex. 23 at ¶ 10. On March 23, 2018, he contacted his attorney of record's firm. *Id.* He learned that SIRVA "sometimes resolve on their own, and that it would be best to treat with an orthopedist if my pain did not go away." *Id.* Therefore, he did not mention his shoulder symptoms during encounters for other concerns. *Id.* at ¶¶ 6-15.

- Petitioner adds that at the time in question, he was significantly occupied with the task of cleaning and selling his deceased father's property, which was a daily 2.5-hour round trip from his own home. Ex. 23 at ¶ 18. His injury from a rusty nail, prompting the vaccine, occurred while working on his father's property. *Id.* Petitioner was also serving as power of attorney for an aunt living in an assisted care facility. *Id.* These responsibilities exacerbated his (well-documented) depression, anxiety, and inattention, thereby delaying his appointment specifically for his shoulder with the orthopedist Dr. Dlabach until June 2018. *Id.*

- Misha Hill Durmeier Webb submitted a supporting affidavit. Ex 15. Ms. Webb met Petitioner on an online dating website in January 2018, but they formed a friendship rather than a romantic relationship. *Id.* at ¶ 4. She recalls that "within a few days of [their] first in-person meeting" on March 3 or 4, 2018, Petitioner mentioned shoulder pain and a "knot" that had "started with" a vaccine that was "administered high on his shoulder." *Id.* at ¶ 7. Ms. Webb's impression was that Petitioner "had already discussed the issue with a healthcare provider." *Id.* Ms. Webb specifically remembers these events because she is employed as a nurse; she herself developed temporary nerve pain after receiving an injection in her hip; and Petitioner was her first date after her husband passed away. *Id.* at ¶ 8.

- In addition, a longtime friend, David Watson, recalls that on a telephone call sometime in 2018, Petitioner shared that "his shoulder started hurting after a vaccination that he had received three to five days before by a nurse at a clinic, the pain was getting worse, and he was concerned." Ex. 14 at ¶ 6.

7

### C. Findings of Fact

There is a four and one-half month gap between Petitioner's vaccination and the first medical record documenting shoulder pain. I have previously found it reasonable to expect that an average individual experiencing sudden post-vaccination pain will seek medical attention, particularly if it is severe.[8] However, an individual may also delay treatment based on an assumption that his or her pain will resolve on its own,[9] which Petitioner avers in this case. Thus, his delay in seeking treatment does not necessarily foreclose a finding of onset within the Table timeframe (although that delay counsels against a large pain and suffering award).

I also recognize the numerous intervening medical records that do not reflect the presence, or importantly, the absence, of shoulder symptoms. There is no question that Petitioner had many opportunities to seek treatment for his pain – and the record reveals he did not hesitate to obtain medical assistance throughout this period. However, Petitioner avers that in many of these encounters, he was focused on a disparate range of unrelated conditions, and he did not mention his shoulder because he was waiting to see an orthopedist for that issue. Additionally, the intervening medical records are not particularly thorough or focused on the shoulder. Many of these encounters were with urgent care providers or specialists on other conditions and areas of the body, who were unlikely to conduct focused questioning or examination of the shoulder without any prompting from Petitioner. And many of these physical examinations lack detail of about the presence or absence of shoulder pain and dysfunction. For all of these reasons, the intervening medical records are similar to those in *Kirby*, in which the petitioner was still able to establish the fact in dispute despite an absence of references in the medical records. *Kirby*, 997 F.3d at 1382-84.

More questionable are Petitioner's recollections that he reported his shoulder pain and the knot in his shoulder to the nurse practitioner on February 21, 2018, and to his new internist on April 11, 2018. Respondent objects that "[i]t defies credulity to believe that two different medical providers would make examination findings, render a diagnosis, and offer advice on a problem without noting it in the records." Response at 5.

---

[8] *Pitts v. Sec'y of Health & Human Servs.*, No. 18-1512v, 2020 WL 2959421, at *5 (Fed. Cl. Spec. Mstr. April 29, 2020); *see also Eshraghi v. Sec'y of Health & Human Servs.*, No. 19-39V, 2021 WL 2809590, at *3 (Fed. Cl. Spec. Mstr. June 4, 2021) (in which the petitioner claimed "excruciating" pain that prevented him from performing many simple, everyday tasks).

[9] *See, e.g.*, *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3082140, at *5 (Fed. Cl. Spec. Mstr. March 30, 2018), *review denied*, 142 Fed. Cl. 329 (2019); *Williams v. Sec'y of Health & Human Servs.*, No. 17-830V, 2019 WL 1040410, at *9 (Fed. Cl. Spec. Mstr. Jan. 31, 2019); *Knauss v. Sec'y of Health & Human Servs.*, No.16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018).

Respondent's point as to whether Petitioner actually reported his shoulder pain to these providers is well-taken, but that does not preclude a finding of onset within 48 hours.[10]

At the same time, there is subsequent record support for Petitioner's onset contentions, as reflected in records from when he did begin to seek the orthopedic treatment he believed was required for the shoulder problem. Dr. Dlabach's and other providers' later records consistently reflect a history of left shoulder pain since the vaccine. While Respondent finds it "notable" that Petitioner had discussed his vaccination and his shoulder injury with counsel before the first medical records documenting those events, there is no evidence that Petitioner changed his account over time or was acting in bad faith. Instead, Petitioner located counsel who appears to have referred him to an orthopedist with specific expertise with SIRVA.[11]

Respondent also contends that the medical records and supporting affidavits documenting Petitioner's shoulder injury are inadequate because they do not describe onset *precisely* within 48 hours. Response at 5-6. This argument is unavailing. The medical records consistently relate the shoulder injury back to the vaccine, in a sufficient manner to connect it close-in-time to injury. Ms. Webb recalls that in early March 2018, Petitioner described that the pain "started with" the vaccine. Mr. Watson recalls Petitioner's report just three to five days after the vaccine, that his pain was "getting worse," which supports that the pain *began* even earlier. In the absence of any documentation of a *contrary* onset, I find that there is preponderant evidence that onset was within 48 hours. 42 C.F.R. § 100.3(c)(10)(iii).

### III. Other Table SIRVA Requirements and Entitlement

In light of the lack of other objections in Respondent's Rule 4(c) Report and my own review of the record, I find that Petitioner has established the other requirements for a Table SIRVA claim. Specifically, there is not a history of prior shoulder pathology that would explain his injury. 42 C.F.R. § 100.3(c)(3)(10)(i).[12] There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. §

---

[10] It is questionable whether Petitioner truly had a "knot" in his shoulder. *See* Ex. 16 at 6 (urgent care encounter for a possible spider bite on his left bicep, where "no induration" was observed); Ex. 4 at 4 (Dr. Dlabach's assessment that "what [Petitioner] is feeling is more of the muscle itself"). However, that is not dispositive for establishing onset or a Table SIRVA claim more generally.

[11] *See* Response at n. 1 (internal citation omitted) (noting that Dr. Dlabach previously served as an expert witness in another case handled by Petitioner's counsel).

[12] While Petitioner was diagnosed with left shoulder tendinitis in September 2015, Ex. 3 at 28, the subsequent medical records do not reflect that as an ongoing concern. Petitioner avers that the tendinitis "completely resolved within about a month." Ex. 1 at ¶ 4.

100.3(c)(3)(10)(iii). The medical records and affidavits support that his shoulder pain and reduced range of motion were limited to the left shoulder. C.F.R. § 100.3(c)(3)(10)(iv). The contemporaneous vaccination record reflects the site of administration as Petitioner's left deltoid. Ex. 2 at 177, 182; Sections 11(c)(1)(A) and (B)(i). Petitioner has not pursued a civil action or other compensation. Ex. 1 at ¶ 12; Section 11(c)(1)(E). Finally, Petitioner suffered the residual effects for more than six months after vaccination.[13] Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### IV.   Conclusion and Scheduling Order

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. I note, however, that onset was a *very* close call. Respondent's objections were not only well-taken, but they revealed a record in which the petitioner had numerous opportunities to seek treatment for an allegedly severe condition, but which he was able to tolerate for a substantial period of time. Although Petitioner was able to marshal other evidence to overcome these issues, in many cases a substantial time gap in treatment coupled with clear evidence of the opportunity to seek medical assistance would be fatal to the claim.

Because of the above, the claimant's damages should largely reflect treatment costs, with a *very* modest (*i.e.*, less than $30,000.00) pain and suffering component. The parties should direct damages discussions in this way – and any demand for a higher award despite my prior warning will be given short shrift.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] *See, e.g.*, Ex. 4 at 11-14 (August 6, 2018, follow-up with Dr. Dlabach); Ex. 5 at 113-268 (physical therapy course from January – March 2019); Ex. 7 at 10-12 (March 29, 2019, primary care encounter for shoulder pain); *but see* Ex. 6 at 3-4 (January 29, 2019, encounter with orthopedist Dr. Ennis, who recorded Petitioner's history of a fall in December 2018 had worsened his condition).